William J. Honan
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200
ATTORNEYS FOR PLAINTIFF
ARMADA BULKCARRIER, LTD.



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARMADA BULKCARRIER, LTD., | 07 Civ. _____ |
| Plaintiff, | **VERIFIED COMPLAINT** |
| -against- | |
| ANDRES RUIZ DE VELASCO S.A., | |
| Defendant. | |

Plaintiff, Armada BulkCarrier, Ltd. ("Plaintiff" or "Armada"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against Andres Ruiz De Velasco, S.A. ("Defendant" or "ARVSA"), alleges, upon information and belief, as follows:

1.    This is a case of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and also falls within the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333 in that it involves claims for deadfreight and other costs arising out of the breach of a maritime contract involving the carriage of coal on a vessel, which claim, following arbitral proceedings between the parties, was reduced to a Final Arbitration Award. Jurisdiction is also proper pursuant to this Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331, with the domestic arbitral award governed by the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2. At all times material herein, plaintiff Armada BulkCarrier, Ltd. was and is a business entity organized and existing under the laws of the Channel Islands and maintains a place of business at 7-11 Britannia Place, Bath Street, St. Helier, Jersey JE4 8US, Channel Islands.

3. Upon information and belief, at all times material herein, defendant ARVSA was and still is a business entity organized under the laws of Spain with an address at Velázquez, 150 - 5° - 28002 Madrid, Spain.

4. Under the terms of a Contract of Affreightment ("COA") dated January 11, 2005 (a continuation of an earlier COA dated March 17, 2004), Armada BulkCarrier, Ltd., as owners of the M/V *Moondance*, (the "Vessel"), agreed to carry four cargoes of coal on various dates from Hampton Roads (Gijon, Spain), for ARVSA, the charterer.

5. Disputes between Armada and ARVSA under the COA were to be resolved by arbitration in New York under United States law and pursuant to the Rules of the Society of Maritime Arbitrators, Inc., New York ("SMA").

6. Disputes subsequently arose between Armada and ARVSA under the COA with respect to *inter alia* the supplying of cargo by charterers and the failure to do so resulting in a deadfreight claim.[1] As a result, Armada demanded arbitration against ARVSA in New York, appointed an arbitrator, and sought deadfreight, interest, and attorneys' fees in connection with prosecuting its claim.

7. ARVSA responded to Armada's arbitration demand by appointing an arbitrator and participating in the arbitration with representation by counsel.

---

[1] Deadfreight is compensation owed by the charterer to an owner when the charterer is unable to load the proper amount of cargo on the vessel as agreed under the COA.

2

8.    On June 19, 2007, the SMA panel ("Panel") found in favor of Armada, awarding it damages for actions taken by ARVSA and costs incurred by Armada, including deadfreight, interest, costs and attorneys' fees (the "Award").  A copy of the Award is attached hereto as Exhibit 1.

11.    As a result of these findings, the Panel awarded Armada the following in the June 19, 2007 arbitration award:

a.    $172,580.13, for the deadfreight claim and interest, interest on the conceded deadfreight ($598.19), less a demurrage adjustment in favor of ARVSA ($11,415.10).  When including the 62 days of interest at 8.25% (on the principal sum of $142,269.70) from July 19, 2007 to September 19, 2007 per the Award for non-payment after 30 days of the Award date ($2021.41), the total is **$163,784.63**; and

b.    **$41,800** in attorneys' fees and expenses.

12.    The Award also included reimbursement by ARVSA of arbitrator fees totaling **$2,900**.

13.    The total amount sought by Plaintiff to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims against Defendant ARVSA include:

a.    the final Award in the combined amount (to date, with interest) of **$208,484,63**;

b.    Attorneys' fees/Expenses:    **$25,000**

c.    Interest on the principal sum of $142,269.70 at 8.25% (per the Award) for 2 years: **$23,474.50**

Total: **$256,959.13**.  Plaintiff also reserves its right pursuant to Rules B and E to seek

additional security should the foregoing amount prove insufficient to secure the full amount of Plaintiff's claim.

14.    Upon information and belief, and after investigation, ARVSA is not found within the Southern District of New York but does have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name (or names) of Andres Ruiz De Velasco, S.A. with, upon information and belief, the following financial institutions:  Bank of America, N.A.; Bank of China; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Banco Popular; Bank of Tokyo-Mitsubishi UFJ Ltd., or any other financial institution within the Southern District of New York.

15.    The Federal Arbitration Act, codified at 9 U.S.C. §1 *et seq.*, provides that domestic arbitral awards may be recognized and enforced as judgments.  Accordingly, the Award is entitled to summary recognition and enforcement as a judgment of this Court.

**WHEREFORE,** Armada BulkCarrier, Ltd. demands judgment as follows:

A.    That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment be issued against bank accounts and other property of Defendant ARVSA with the financial institutions noted above in paragraph 14;

B.    That Defendant ARVSA and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

C.    That judgment be entered in favor of Plaintiff Armada BulkCarrier, Ltd. and

against Defendant ARVSA in the amount of $256,959.13 (including estimated interest and attorneys' fees);

D.    That the final arbitration award be recognized as a Judgment of this Court pursuant to 9 U.S.C. §1 *et seq.;* and

E.    That this Court grant Armada BulkCarrier, Ltd. such other and further relief which it may deem just and proper.


Dated: New York, New York
      September 20, 2007


                     HOLLAND & KNIGHT LLP


By:_____
            William J. Honan
            Christopher R. Nolan
            195 Broadway
            New York, NY 10007-3189
            Tel:    (212) 513-3200
            Fax:   (212) 385-9010

            *Attorneys for Plaintiff Armada BulkCarrier, Ltd.*

## **VERIFICATION**

STATE OF NEW YORK              )

                                                      :ss.:

COUNTY OF NEW YORK          )

CHRISTOPHER R. NOLAN, being duly sworn, deposes and says:

I am associated with the firm Holland & Knight LLP, counsel for Armada BulkCarrier, Ltd., plaintiff in the foregoing action.  I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge.  I have reviewed documentation provided to me by Armada BulkCarrier, Ltd. and corresponded with Armada BulkCarrier, Ltd. representatives regarding this matter.  I am authorized by Armada BulkCarrier, Ltd. to make this verification, and the reason for my making it as opposed to an officer or director of Armada BulkCarrier, Ltd. is that there are none within the jurisdiction of this Honorable Court.

_____

Christopher R. Nolan

Sworn to before me this
20th day of September, 2007

_____
Notary Public

# 4800198_v1

DIALYZ E. MORALES
Notary Public, State Of New York
No. 01MO6059215
Qualified In New York County
Commission Expires June 25, 2011

6

# EXHIBIT 1

In the Matter of the Arbitration

between

Armada BulkCarrier, Ltd., Jersey
as Disponent Owner of the
M/V MOONDANCE

and

Andres Ruiz de Velasco S.A.,
as Charterer

+

Under a Contract of Affreightment, based
upon the AMWELSH 1993 Form of
Charter Party dated January 11, 2005

**FINAL AWARD**
June 19, 2007

Before:

Klaus C. J. Mordhorst
A.J. Siciliano
Michael A. van Gelder, Chairman

Appearances:

For Disponent Owner:
Holland & Knight LLP,
William J. Honan, Esq., of Counsel

For Charterer:
Richard A. Zimmerman, Esq., of Counsel

1

BACKGROUND:

Under the terms of a Contract of Affreightment (COA) on the "NALON Private Form based on AMWELSH Coal C/P, revised 1993", dated January 11, 2005, (which in turn was in direct continuation of an earlier COA, dated March 17, 2004), (hereinafter COA),, Armada BulkCarrier, Disponent Owner (hereinafter Owner or Armada) of M/V MOONDANCE (vessel) agreed to carry four cargoes of coal in bulk at various dates from Hampton Roads to Gijon (Spain) for account of Andres Ruiz de Velasco, S.A., Charterer (hereinafter ARVSA or Charterer).

 Owner nominated M/V MOONDANCE to load 25,000 MT 10% more or less in Owner's option with laydays September 15/30 2005 (later amended to 20/30 September), expected cargo intake 27,500 MT.   Upon receiving Owner's nomination,  ARVSA advised  it would load coal from three different suppliers  and proposed a preliminary stowage plan for the Master's approval as follows:

```
No1  3,217 ALPHA GRADE
No2  6,115 ALPHA
No3  6,145 ALPHA
No4  6,137 CONSOL
No5  5,886 INTEGRITY
     =====
Total 27,500 MT
```

On September 19 ARVSA sent an e-mail to Owner, advising it had received notice from Consol, one of the coal suppliers, of an accident at the Buchanan mine.  Consol declared Force Majeure under its coal sales contract for MOONDANCE and one other unrelated

2

vessel. ARVSA asked Owner to review the situation and be prepared to mitigate any damages "for this unexpected Force Majeure situation". Charterer followed this e-mail with another on September 20 declaring Force Majeure for the quantity intended to be supplied by Consol. September 21, Charterer stated its intention to load and sail with only 21/23,000 MT. That same message also indicated that Charterer was trying to arrange for replacement coal of the same type as the Buchanan mine but that appeared difficult. The e-mail asked Owner to confirm whether it would perform the voyage with reduced cargo or "withdraw the vessel."

Owner replied on September 22 that the COA was silent on particular grades of coal, that Charterer should load a full cargo with any grade available and should it fail to do so Charterer would be responsible for the resulting deadfreight. In Owner's view, nothing prevented Charterer from completing the ship with any grade of coal from any mine other than the Buchanan mine. ARVSA, however, maintained that the coal intended for MOONDANCE was specialized coal for furnace coke and could not be replaced with untested/unapproved coal. There followed a further exchange of e-mails in which both parties maintained their view points. Despite the Master's protest of the shortlifted quantity, the vessel completed loading and sailed on September 27 with only 21,108.954 MT of coal.

Owner submitted a freight bill for the full 27,500 MT, which ARVSA declined to pay. Instead, ARVSA asked for a fresh invoice limited to the amount of cargo actually loaded, plus 246.046 MT of deadfreight, acknowledged to be due Owner for shortloading the remaining parcels. Thereafter, Owner submitted a laytime account for demurrage using

3

only the bills of lading quantities totaling 21,108.954 MT as the basis for calculating allowed laytime. The record is silent as to when/how Charterer paid the freight and demurrage invoices, but payment for the small amount of deadfreight conceded by ARVSA was not made until February 2007.

## CLAIMS:

Armada has submitted a claim for $145,636.19 together with interest on that sum at 8.25%, interest on the delayed payment of $6,151.15 for the uncontested deadfreight, and its costs incurred in prosecuting the claim including attorney's fees. Armada also asked that the panel's fees be assessed entirely against ARVSA.

In support of its claim, Owner submitted two bills of lading showing the quantities of coal loaded, statements of facts from load and discharge ports, a laytime calculation and several documents certifying that space for 27,522 MT was actually available in the ship for cargo, and its calculation of deadfreight amounting to $151,787.34.

Not only did ARVSA deny liability for the remaining deadfreight, it asked that the demurrage previously paid to Armada be recalculated on the basis of the admitted and since paid deadfreight claim. Moreover, ARVSA seeks an award for its reasonable attorney fees and that the panel's fees be assessed against Armada.

## PROCEEDINGS:

The COA contained an Arbitration Clause calling for any disputes between the parties to be resolved by Arbitration in New York under United States law pursuant to the Rules of

4

the Society of Maritime Arbitrators, Inc., New York. Owner demanded arbitration and named Mr. Siciliano as its appointed arbitrator. Charterer named Mr. Mordhorst and these two arbitrators appointed Mr. van Gelder to act as the third arbitrator and chairman of the panel.

Subsequent to the initial submissions, Armada requested disclosure of the following information:

a) any e-mails/correspondence by Mr. de Valesco to support his statement that he had tried, but failed to find replacement for the 6145 MT short delivered from Buchanan mine.
b) copies of the sales contract between Consol and Nalon.

After some delay, ARVSA produced evidence of an English language Coal Sales Agreement dated April 1, 2004 between Nalon (buyer) and Consolidation Coal Company and Island Creek Coal Company (collectively seller). This document showed that the source of coal was to be seller's mine at Buchanan. However, the quantities to be shipped, periods of shipment, the quality specification of the coal as well as some other information had been purposely deleted from the document. ARVSA also produced a document in the Spanish language between itself and a Dr. Jose Me. Corbi dated April 1, 2004. Despite the panel ruling that any document in a foreign language needed an English translation before it could be admitted into evidence, no translation of this document was submitted.

ARVSA did, however, submit two sets of e-mails between Nalon and Integrity Coal indicating that, although no additional Mid Volatile coal was available, Integrity was able to promptly supply another grade of coal with seemingly similar specifications.

5

The matter was presented by both parties on documents only followed by an exchange of closing briefs.

In support of its denial of liability, ARVSA submitted a letter from Consol Energy Inc. (Consol) dated September 19, 2005 addressed to its buyer (Industrial Quimica del Nalon) detailing the event at the Buchanan Mine and declaring Force Majeure under the terms of the sale contract.   Reportedly, on September 16, 2005, the skip hoist at the Buchanan mine failed causing both a loaded and unloaded skip to fall some 1,600 feet to the bottom of the mine shaft.   The incident is said to have so disrupted operations that the coal intended for the MOONDANCE could not be loaded into railcars for transport to the ship.

In addition, ARVSA submitted a declaration from Mr. Carlos de Velasco, its Managing Director, describing the role of ARVSA as agents for Consol Energy in Spain and  that it charters vessels for Consol to facilitate  its sales.  He stated it was he who concluded the original COA with Armada and that the current COA was a continuation of the original contract.  Mr. de Velasco also stated that on those earlier voyages Armada had loaded several different grades of coal in separate holds and thus Armada was or should have been aware of ARVSA's intention to load different grades on MOONDANCE.  Upon receiving the information from Consol of the Force Majeure situation at Buchanan mine, he tried diligently to find a suitable grade of coal to replace the 6,145 MT shut out, but was unable to do so.  As a result, stated Mr. de Velasco, it was his understanding that clause 10 of the COA protected both parties from the consequences of a Force Majeure event, such as occurred at the Buchanan mine.

ARVSA also submitted a sworn declaration by Mr.Yokoi, President of Consolidated Ocean Transportation, Inc. (Conocean), the broker, describing his career as a specialist in chartering bulk coal cargoes, and that he was familiar with the circumstances of the two COAs in question. His declaration supports that of Mr. de Velasco and also confirms his own understanding that clause 10 was intended to protect both sides in case of a Force Majeure situation.

## ARGUMENTS:

Armada contends that the law in the United States and in England (citing cases) is that in order to avoid liability for failing to produce cargo, a charterer must show both that an excepted event occurred, and that no other permissible cargo was available. Owner insists ARVSA has not carried that burden

Armada points out that clause 10 of the COA does not contain a Force Majeure provision and neither does the portion of the sales contract put in evidence. If there is no Force Majeure clause in the contract, ARVSA can hardly rely upon one for its defense. Both the De Velasco and Yokai Declarations put into evidence by ARVSA state the declarers' understanding of the "intention of the parties" concerning the meaning of clause 10. But a statement from the individual who negotiated the COA for Armada insists no such discussion concerning the interpretation of clause 10 took place between him, ARVSA and/or its broker (Mr. Yokoi).

As to ARVSA's statement that Armada was aware that different grades of coal were shipped under the previous COA, Armada points out, that only two cargoes were lifted under that COA, which hardly constitutes a course of dealing. Armada contends the

7

COA merely described the cargo as "Coal in bulk" rather than any specific grade or grades of coal. Therefore ARVSA was required to provide a full cargo of any coal in bulk. It cannot now argue that only that specific grade of coal for which the Vessel was stemmed and which was not available as a result of the event at Buchanan mine, relieves it of the obligation to pay deadfreight. Armada maintains that authorities both in United States and in England support its position. In any event, Armada points to ARVSA's own evidence that a suitable quantity of replacement coal could have been made available for MOONDANCE but, for its own unexplained reasons, ARVSA chose not to provide it.

ARVSA argues that this COA calls for disputes to be arbitrated subject to U.S. law and therefore all references to English law should be disregarded. It further refers the panel to an arbitration dated 1992 (SMA 2824) where a panel decided that a charterer was not responsible for deadfreight for coal stemmed which later became unavailable as a result of a railroad strike which prevented the cargo from being transported to the load terminal.

Clause 10, asserts ARVSA, excuses it from loading the 6,145 MT of the cargo that was unavailable due to the Force Majeure event at Buchanan mine. The clause in pertinent parts reads:

> Neither the ... Owners nor the Charterers shall, unless otherwise expressly provide (sic) in this charter party, be responsible for... failure to supply ...
> the cargo resulting from... accidents at the mines or to machinery... or any other causes beyond the Owners (sic) or the Charterer (sic) control; always provided that such events directly affect the loading and/or discharging process of the Vessel, and its performance under this Charter Party

As stated in the Declarations of Mr. Velasco and Mr. Yokoi, part of the cargo stemmed for the MOONDANCE could not be loaded onto the railcars required to transport the cargo to the load terminal. The event constituted a Force Majeure situation in that the accident at the mine prevented ARVSA from loading that specific quantity of cargo. Moreover, the COA also provided that each nomination is "subject to stem", which means subject to the availability of the cargo on the date the ship is offered to load. ARVSA cites from Voyage Charters, 2d Ed. 2001, at para. 1.23, reading:

> [Subject to stem] This term means that the contract is conditional upon the charterer obtaining a cargo for the agreed loading period, such that failure to obtain it relieves both parties of their obligations conditionally agreed. It is not the availability of cargo in general but the obtaining of it that is important and, in the absence of words or circumstances indicating otherwise, there is no obligation on the charterer to use reasonable efforts to obtain a cargo.

ARVSA further argues that Armada was aware from previous voyages that the MOONDANCE cargo would consist of various grades of coal. As in the past, ARVSA provided ARMADA with specific details of the grades and suppliers of the coal intended for MOONDANCE. Therefore, it was not obliged to provide an alternative generic homogeneous coal cargo. Nevertheless, ARVSA did its best to replace the coal that was unavailable, due to the Force Majeure situation.

ARVSA submits that Armada's own quotes from Voyage Charters (2 ed.2001) allows that Charterer will be excused if it is impossible or unreasonable in a business sense to obtain replacement cargo from an alternative source. This is exactly the position in which ARVSA found itself. Armada's contention that ARVSA was obliged to provide any type of generic coal for the vessel is unavailing. Instead, ARVSA contends that the

9

only meaning that can be given to the word "cargo" is that it refers to the specific cargo nominated for this ship.

As for meeting its burden, ARVSA asserts that the correspondence between the parties, specifying that the coal stemmed for MOONDANCE had specific characteristics essential to making furnace coke and, therefore, could not be replaced with other untested/unproved coal. Nevertheless, ARVSA tried its best to find suitable replacement for that 6,145 MT parcel. Clause 10 specifies that the excepted event at the mine must directly affect the loading/discharging process of the vessel which, ARVSA argues, was the case here as the accident at the mine occurred shortly before the vessel was due to load. Thus, that accident and its immediate consequences are tied directly to the cargo destined for MOONDANCE. ARVSA, therefore, submits that the evidence and the law clearly excuse it from having to pay deadfreight and the panel should not only award it legal costs but also require Armada to pay the fees of the arbitrators.

## DELIBERATION and DECISION:

After a thorough review of the evidence and arguments offered by the parties the panel unanimously finds that Owner is entitled to the deadfreight and interest claimed. Our reasons for this decision and its impact upon the calculation of allowed laytime are set forth below:

ARVSA correctly argued that under the COA, each nomination of a performing vessel was "subject to stem, shipper and receiver's approval", but once those conditions are lifted , as was the case here, the obligation of Charterer to provide that cargo is absolute. The panel noted that the COA contained an Exceptions rather than a Force Majeure

10

clause which excused performance due to "...accidents at the mines"... provided such accidents "... directly affect the loading and/or discharging process of the Vessel..." . Due to a lack of clear evidence on the point, the panel was unable to form an opinion as to whether Consol was permitted to declare Force Majeure under its coal sales contract with ARVSA , but we assume it was. Nevertheless, we are satisfied that the accident at the Buchanan mine did interrupt ARVSA's intended coal supply and that, in turn, directly affected its ability to load that coal parcel on the MOONDANCE . However, that does not end the enquiry. Unless otherwise excused, Charterer remains responsible to supply a full cargo from other sources. Only when that is shown to be impossible or commercially impractical is Charterer relieved of that obligation.

The Declaration of Mr. de Velasco stated that he had made every effort but was unable to find replacement coal, is contradicted by the exchange of e-mails on September 20, 2005 between Nalon and Integrity International Corporation. In that exchange it is evident that alternative coal was available, even though not exactly matching the specified quality presumably set out in the coal sales contract... The sales contract offered in evidence by Charterer purposely expunged the specifications for the contracted coal, making it impossible for the panel to consider whether the alternative coal offered was indeed a reasonable substitute. Under the circumstances, the panel has no choice but to assume that the withheld specification was adverse to ARVSA's position.

The panel noted that the COA only described the cargo as "Coal", without any other qualification. It is well established that a charterer is obligated to furnish the cargo as

11

described in the contract. Absent clear language to the contrary, a charterer may not unilaterally impose its personal preferences as to what specific cargo was intended. Earlier versions of the AMWELSH form did restrict a charterer's obligations to only that cargo "for which the vessel is stemmed",[1] but that is not the case under the "AMWELSH 93" form used for this COA.

For all these reasons, the panel finds for Owner in the matter of deadfreight.

A lesser dispute arose on the matter of payment of a sum of $6,151.15 deadfreight conceded by Charterer but which remained unpaid until February 2007. Interest for the period of delayed payment is awarded to Owner from the date that it should have paid to the date of actual payment (see calculation in the Award Section below).

The panel also reviewed Owner's calculation of laytime and demurrage. Although Charterer made reference to the issue in its presentation, no specific figure was claimed as overpayment. The Arbitration Clause in the COA specified that any arbitration be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc., Rule 30 of which states in part:

> "The Panel, in its Award, shall grant any remedy or relief which it deems just and equitable…"

The panel considers it just and equitable to revise Owner's calculations of laytime and demurrage to reflect its successful deadfreight claim. We consider it well established that the amount of laytime allowed be linked to the total feight claimed, including deadfreight, except where the contract of carriage provides otherwise[2] . Accordingly, the

---

[1] For example see the 1953 and 1979 Forms
[2] Such as those charters which limit allowed laytime to intake quantities.

12

panel has reviewed the amount of demurrage payable and dispatch earned by Charterer and adjusted it to account for its award of deadfreight to Owner.  The resulting figures are included in the Award Section below.

Both parties have asked for their legal costs to be allowed and for the panel's fees to be charged against the other.  In considering the extent of the final award, the panel rules that Owner is allowed the  sum  designated in the Award Section as compensation for its legal costs and that the fees of the panel are payable one third by Owner and two thirds by Charterer.

AWARD:

Charterer is hereby ordered to pay to Owner the following amounts:

| DEADFREIGHT | $151,787.34 | |
| Interest at 8.0% p.a. from October 2, 2005 | | |
| To June 19, 2007 | $ 20,792.79 | $172,580.13 |

| INTEREST ON CONCEDED DEADFREIGHT | | |
| Interest on $6,151.15 at 7.75% p.a. from | | |
| October 2, 2005 to February 1, 2007 | | $   598.19 |

LAYTIME
| Cargo loaded | 21,108.954 MT |
| Deadfreight conceded | 246.046 MT |
| Deadfreight awarded | 6,145.000 MT |
| | 27,500.000 MT |

Loading:
| 27,500 MT at 25,000 MT/WWD/SHINC | 1D 2H 24M |
| Time used | 4D 7H 25M |
| Time on Demurrage | 3D 5H 11M |

| or 3.2159 days at $17,000 p.d./pro rata | $54,670.30 |
| less Address Comission (5%) * | ($  2,733.52) |
| Owner due net | $51,936.78 |

Discharging:
27,500 MT at 12,000 MT/WWD/SHINC    2D   7H   0M
Time used                            0D 23H   0M
Laytime saved                    1D   8H   0M

or 1.3333 days at $8,500 **           $11,333.05

Laytime Recapitulation:
Owner was paid demurrage      $60,763.83
Less 5% Address Commission   ($ 3.03819)   $57,725.64
      Owner Due                       $51,936.78
      Refund due Charterer            $ 5,788.86

Owner paid Despatch         $ 7,006.07
Despatch due Charterer       $11,333.05
Additional Despatch due             $ 4,326.98
Net Credit due Charterer          $10,115.84

Interest on $10,115.84 at 8.0% p.a. from
November 10, 2005 to June19, 2007
                                 $ 1,299.26
Total due Charterer                         ($ 11,415.10)

OWNER'S LEGAL FEES/COSTS
   Allowance towards Owner's attorney's
   Fees and costs                            $ 41,800.00

      Total Award due Owner            $203,563.22

\*    see theYokoi Declaration (attached to Charterer's Reply
     Memorandum (April 10, 2006) at Point 4: "address com-
     Mission should state 5% instead of 6.25%" and "all
     settlements under the Charter were made correctly at 5%"

\*\*   see Charterer's Exhibit 16 – despatch was wrongly calculated
     by Owner a $8,750/day

Charterer is ordered to make full payment of the above sum to Owner within 30 days of

the date of this award.  Should such payment not be made, interest on the principle sum

of $142,269.70 at 8.25% p.a. or prorata shall resume and continue to accrue from the date

of this award until paid or the Award is entered for judgment in a court of competent jurisdiction, which ever first occurs.

The amount and allocation of the arbitrators' fees are set out in Appendix A attached, which by this reference is made part of the final award.

The arbitration clause (Clause 34) provides that this award may be made a rule of court.


Klaus C. J. Mordhorst


A. J. Siciliano


Michael A. van Gelder
Chairman


New York, NY
June 19, 2007

15

## APPENDIX "A" to Final Award dated June 19, 2007

### In the Matter of the Arbitration between Armada BulkCarrier Ltd. of Jersey And Andres Ruiz de Velasco S.A. - M/V MOONDANCE

The panel fees and expenses for rendering this award are set at $19,350.00 payable one third ($6,450.00) by Armada and two thirds ($12,900.00) by ARVSA. This allocation represents a shortfall by ARVSA in the sum of $2,900.00 from the deposit of $10,000.00 deposited by ARVSA as security into the escrow account. This sum ($2,900.00) is payable by ARVSA to Armada together with the sum awarded in the Final Award within 30 days from the date of the award and is also subject to interest at 8.25% p.a. if not paid within that period.

The fees due to the arbitrators are to be paid from the escrow account established by the parties with the Society of Maritime Arbitrators, Inc., New York (SMA) as noted below:

| | |
|---|---|
| To Mr. Siciliano | $6,125.00 |
| To Mr. Mordhorst | $6,225.00 |
| To Mr. van Gelder | $7,000.00 |

SMA is to pay the balance of the escrow fund ($650.00) to Armada together with accrued interest on its deposit of $10,000.00. Interest which has accrued on the sum of $10,000.00 deposited by ARVSA is payable to that company when all other payments detailed in the Final Award and this Appendix "A" have been paid.

Payment of the total amount of the fees remains the joint and several responsibility of both parties.